IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SCOTT C. FANDRICH,                                    Civil No. 05-998-CO

      Plaintiff,                          FINDINGS AND RECOMMENDATION

         v.

JO ANNE B. BARNHART,
Commissioner, Social Security Commission,

      Defendant.


COONEY, Magistrate Judge.

Plaintiff Scott C. Fandrich brings this action pursuant to section 205(g) of the Social Security Act, as amended (Act), 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner's final decision denying plaintiff's application for disability insurance benefits. For the several reasons set forth below, the decision of the Commissioner should be affirmed.

## **BACKGROUND**

Plaintiff applied for disability insurance benefits alleging disability commencing November 17, 1997, later amended to April 5, 2002. His applications were denied. Plaintiff requested a hearing, which was held before an Administrative Law Judge (ALJ) on June 17, 2004. Plaintiff, represented by counsel, appeared and testified, as did a lay witnesses, and a vocational expert. On August 25, 2004, the ALJ rendered an adverse decision, and the Appeals Council denied plaintiff's request for review.

At the time of the ALJ's decision, plaintiff was forty-six years old. Plaintiff has a high school education. He has relevant past work experience as a metal fabric worker, a warehouse worker, machine operator/roofer, and a janitor. Plaintiff alleges disability as of April 5, 2002, based upon nerve damage, degenerative disease of disc and spine, and disc herniation in lower spine. The relevant medical evidence is discussed below.

## **STANDARDS**

This Court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record. Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229

2 - FINDINGS AND RECOMMENDATION

(1938)).  The Court considers the record as a whole, and  weighs "both the evidence that supports and detracts from the [Commissioner's] conclusion." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  Where the evidence is susceptible of more than one rational interpretation, the Commissioner's conclusion must be upheld.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  Questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner, Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971), but any negative credibility findings must be supported by findings on the record and supported by substantial evidence, Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738 (9th Cir. 1991).  The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g). However, even where findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision."  Flake v. Gardner, 399 F.2d 532, 540 (9th Cir. 1968); see also Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  Under sentence four of 42 U.S.C. § 405(g), the Court has the power to enter, upon the pleadings and transcript record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing.

## COMMISSIONER'S DECISION

The initial burden of proof rests upon the claimant to establish disability. Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

A five-step sequential process exists for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." Yuckert, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b). In the present case, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period under review. (Tr. 16, 24.)

In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." If the Commissioner finds in the negative, the claimant is deemed not disabled. If the Commissioner finds a severe impairment or combination thereof, the inquiry moves to step three. Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520©), 416.920©). In the instant case, the ALJ found that plaintiff's "disorder of the back" was a severe impairment. (Tr. 19.) Accordingly, the inquiry moved to step three.

4 - FINDINGS AND RECOMMENDATION

In step three, the analysis focuses on whether the impairment or combination of impairments meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis proceeds to step four. Yuckert, 482 U.S. at 141.  In this case, the ALJ found that plaintiff's impairment, singly, was not severe enough to meet or medically equal any of the listed impairments.  (Tr. 19, 24.)

In step four, the Commissioner determines whether the claimant can still perform his "past relevant work."  If the claimant is so able, then the Commissioner finds the claimant "not disabled."  Otherwise, the inquiry advances to step five.  20 C.F.R. §§ 404.1520(e), 416.920(e).   The Commissioner must first identify the claimant's residual functional capacity (RFC), which should reflect the individual's maximum remaining ability to perform sustained work activities in an ordinary work setting for eight hours a day, five days a week.  Social Security Ruling (SSR) 96-8p. The RFC is based on all relevant evidence in the case record, including the treating physician's medical opinions about what an individual can still do despite impairments.  Id.  In this case, the ALJ found that plaintiff had the RFC to perform: a limited range of light exertion work involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; the range

5 - FINDINGS AND RECOMMENDATION

of light exertion work activity is narrowed by non-exertional limitations–he is restricted to occasionally crouch, stoop, or bend, and he is restricted to 1-2-3-steps work.  (Tr. 19, 24.)  The ALJ found that plaintiff could not perform his past relevant work.  (Tr. 23, 25.)  Accordingly, the inquiry moved to step five.

In step five, the burden is on the Commissioner to establish that the claimant is capable of performing other work that exists in the national economy.  Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).  If the Commissioner fails to meet this burden, then the claimant is deemed disabled.  Here, the ALJ found that plaintiff retained the residual functional capacity to perform a significant number of other jobs existing in the national economy, such as packager, and small products assembly.  (Tr. 24, 25.)  Therefore, the ALJ found that plaintiff has not been disabled at any time since April 5, 2002, and is not entitled to a disability benefit.  (Tr. 24, 25.)

## DISCUSSION

Plaintiff asserts that the ALJ's decision should be reversed because  the ALJ erred:  (1) in failing to find as severe his condition of carpal tunnel syndrome; (2) in finding that his low back condition did not meet or equal the criteria of Listing 1.04; (3) in his reading of the consulting physician's opinion and in deferring to the opinion of the DDS consulting physician over those of plaintiff's primary care

physician and neurosurgeon; (4) in finding him partially not credible; and (5) in failing to correctly describe his restrictions to the vocational expert.

**Carpal Tunnel Syndrome**

In contending that the ALJ erred in failing to find as severe his condition of carpal tunnel syndrome, he refers to a diagnosis and treatment of the condition in 2000, and to its inclusion by the DDS consulting physician, Martin Kehrli, M.D., in his February 2003 assessment. Defendant responds that this treatment occurred prior to plaintiff's amended alleged onset date of April 5, 2002, and this medical evidence is outside of the relevant time period addressed by the ALJ, as confirmed by plaintiff's counsel at the hearing. Defendant contends that Dr. Kehrli's assessment was based on plaintiff's original alleged onset date of disability and premised on medical records done prior to the period of time adjudicated in the ALJ's decision, and that Dr. Jensen, who completed a residual functional capacity (RFC) assessment on reconsideration of plaintiff's application, assessed plaintiff's carpal tunnel syndrome as mild. Defendant contends that the ALJ considered Dr. Kehrli's and Dr. Jensen's assessments, and rejected Dr. Kehrli's manipulative restrictions as not supported by the record. She contends that the medical evidence relied on by plaintiff does not show that his carpal tunnel syndrome is a severe impairment. Plaintiff replies that the medical records concerning his carpal tunnel

syndrome were not excluded from the record and that the restrictions assessed by Dr. Kehrli affect his ability to work and should be considered.

An impairment is considered non-severe if it does not significantly limit a claimant's ability to do basic work activities.  20 C.F.R. § 404.1521(a); SSR 96-3p.

At plaintiff's hearing, his counsel told the ALJ that the records relevant to the amended onset date of April 5, 2002, were "B7F and later," (Tr. 456); exhibit B7F is dated April 23, 2002, (Tr. 352-53).  The Court notes that plaintiff's counsel informed the ALJ at that time that plaintiff was seeking disability on two theories: that plaintiff meets listing 1.04A, and, alternatively, his herniated disc limits his work so that he is unable to be employed.  (Tr. 456-57.)  Listing 1.04A concerns disorders of the spine, see infra.  No mention was made of any limitation due to carpal tunnel syndrome.

In his decision, the ALJ noted that the record included documents covering a period prior to plaintiff's amended alleged onset date of April 5, 2002, and concluded that he did not need to refer to any document prior to that date.  (Tr. 16.)   In assessing plaintiff's RFC, the ALJ considered the February 24, 2003, assessment of Martin Kehrli, M.D., a Disability Determination Services (DDS) non-examining physician, (Tr. 403-18), in which Dr. Kehrli found that plaintiff was limited in his ability to perform handling (fine manipulation).  (Tr.22.)  The ALJ found that Dr. Kehrli's statements were reasonably supported by the record, with the exception

of the manipulative restriction.  (Tr. 22.)  The ALJ also considered the April 14, 2003, assessment by non-examining DDS physician, Linda Jensen, M.D., in which she found that plaintiff's carpal tunnel syndrome was "mild," and no manipulative limitations were noted, (Tr. 419-28).  (Tr. 22.)  The ALJ adopted the limitations described by Dr. Kehrli and Dr. Jensen, but found: "I did not see anything in the record in support for manipulative restriction as a result of carpal tunnel syndrome." (Tr. 23.)

The Court finds that the ALJ's conclusion is supported by the record.  A nerve conduction report dated November 17, 2000, indicated findings of "mild median compression neuropathy at the carpal tunnel and mild ulnar neuropathy at the level of the elbow."[1]  (Tr. 343-46; see Tr. 208, 222, 224.)  On December 27, 2000, in an outpatient neurosurgery consultation, plaintiff stated that symptoms of numbing, tingling paresthesias[2] in his right hand had resolved and he had had no paresthesias of numbness for two weeks.  The impression was "Resolving ulnar neuropathy." (Tr. 224.)  A March 20, 2001, clinic note reflects plaintiff's history of carpal tunnel syndrome and mild ulnar neuropathy and states that "Overall, patient appears to be

---

[1]   Ulnar is defined as "Relating to the ulna, or to any of the structures (e.g., artery, nerve) named from it; relating to the ulnar or medial aspect of the upper limb."  Ulna is defined as "The medial and larger of the two bones of the forearm."  Stedman's Medical Dictionary (28th ed. 2006).

[2]   Paresthesia is defined as "A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking)."  Stedman's Medical Dictionary (28th ed. 2006).

improving." (Tr. 222-23.) On August 15, 2001, progress notes indicated a history of tingling and numbing of the fingers of the right hand. It was noted that "Driving and/or, coming [sic] hair and/or use of hand usually does notagravate [sic] the symptoms." Following physical examination, the impression was, "Minimal carpal tunnel symptoms and signs are noted. Patient's [n]octurnal aggravation of his hand symptoms are gone now and patient has no neurological findings." (Tr. 205-07.) In primary care clinic notes of the same date, on review of systems, plaintiff "denies any paresthesias currently involving his bilateral hands." (Tr. 218-19.)

On this record, the Court finds that the ALJ did not err in not finding that plaintiff's carpal tunnel syndrome was a severe impairment.

**Listing 1.04A**

Plaintiff contends that his low back condition meets the criteria of Listing 1.04A. He contends that his testimony of continuous pain and the feeling that he is losing control of the leg muscles is medically equivalent to the listing criteria. (Pl. Opening Mem. At 6.) Defendant responds that plaintiff cites no medical evidence in support of his assertion and medical equivalence must be based on medical findings. She further contends that plaintiff's subjective testimony of pain and sensation of losing control over his leg muscles does not establish the listing criteria of atrophy or loss of sensation or reflexes. Plaintiff replies that his back condition is medically equivalent to Listing 1.04A. He also contends that, in the alternative,

the case should be remanded to obtain necessary new information pursuant to SSR

83-19.

> Listing 1.04A provides:
>
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the caudia equina) or the spinal cord.
> With:
> A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. § 404, App. 1.

Plaintiff was seen by Frank Warda, M.D., and Darrell C. Brett, M.D.,

concerning his back condition.  The results of a lumbar myelogram of December 3,

2003, showed, "Findings consistent with broad-based central herniation at L4-5 with

the sacs anteriorly and the disc space as well as affecting the L5 nerve roots

bilaterally, more on the left than on the right."  (Tr. 361, 371, 395, 396.)  In his

brief, plaintiff concedes that he does not meet all the criteria of Listing 1.04A,

asserting that, "Although there were no medical findings of motor loss," his

testimony that he experienced continuous pain in his back and legs and feels like

he is losing control of the muscles in his leg is medically equivalent to the listing

criteria.  (Pl. Opening Mem. At 6.)  Plaintiff relies on the following testimony of his

given at the hearing:

> Shooting pain going down my left and right leg, and I'll get it up
> between my shoulders.  Mostly shooting down my leg, all the way to
> my feet.  And I'll get a numbing feeling in my legs, a tingling feeling,
> where I feel like I'm getting jabbed in the legs, and I'm losing control
> over the muscles.

(Tr. 464.)  He contends that his complaints of pain are verified by his house mate,

Frieda Grieve, (Tr. 467-68).

20 C.F.R. § 404.1526, relating to medical equivalence, provides in pertinent

part:

> (b) How do we determine medical equivalence?  We can find medical
> equivalence in three ways.
>> (1)(I) If you have an impairment that is described in appendix
>> 1, but--
>>> (A) You do not exhibit one or more of the findings
>>> specified in the particular listing, or
>>> . . . .
>> (ii) We will find that your impairment is medically equivalent to
>> that listing if you have other findings related to your impairment
>> that are at least of equal medical significance to the required
>> criteria.
>> . . . .

Citing 20 C.F.R. § 404.1526, the Ninth Circuit in Marcia v. Sullivan, 900 F.2d 172,

175-76 (9th Cir. 1990), stated in this regard: "

> Medical equivalence will be found "if the medical findings are at least
> equal in severity and duration to the listed findings."  Equivalence is
> determined on the basis of a comparison between the "symptoms,
> signs and laboratory findings'"about the claimant's impairment as

12 - FINDINGS AND RECOMMENDATION

evidenced by the medical records 'with the medical criteria shown with the listed impairment."

It is clear that, under the regulations, medical equivalence is based on medical findings as evidenced in medical records. Accordingly, plaintiff cannot rely on his own testimony to establish medical equivalence. Plaintiff points to no medical records which might establish the medical equivalence of motor loss, as required to meet Listing 1.04A.

In his reply, plaintiff asserts a new argument. He contends that, pursuant to SSR 83-19, "the ALJ must obtain an 'updated medical judgment from a medical advisor' when evidence is received which might change to [sic] determination." (Pl. Reply at 2.) He requests that, in the alternative, the case be remanded to obtain this new information.

Generally, the Court does not address new arguments made in a reply brief, since the opposing party has no opportunity to address it. In any event, SSR 83-19, upon which plaintiff relies, was rescinded by SSR 91-7c. SSR 96-6p appears to address the issue raised by plaintiff. However, in support of his argument, plaintiff points to no "additional medical evidence" received which, in the opinion of the ALJ might change a finding of no equivalence in severity to an impairment. See SSR 96-6p. Plaintiff does not support his argument that an updated medical opinion from

a medical expert was required in the circumstances shown in the record.  <u>See</u> SSR 96-6p.

The Court finds that the ALJ did not err in finding that plaintiff's back condition did not meet or equal Listing 1.04A.

## Plaintiff's Credibility

Plaintiff contends that the ALJ erred in finding that his statements regarding his activities of daily living to be inconsistent with his testimony of severe pain and therefore finding him not entirely credible.  He contends that his testimony that he was able to carry out some of his usual activities, with restrictions, but that he experiences pain when he exceeds that is consistent with his reports to his physicians and the testimony of his house mate, Frieda Grieve.  Defendant contends that the ALJ gave clear and convincing reasons for finding that plaintiff was not entirely credible.  Plaintiff replies that his testimony, Ms. Grieve's testimony, and the record are consistent in the description of what he can and cannot do.

In rejecting a claimant's testimony, the Commissioner must perform a two stage analysis.  <u>Smolen v Chater</u>, 80 F.3d 1273, 1281 (9th Cir. 1996).  The first stage is the <u>Cotton</u> test, <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986).  Under this test a claimant must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  All that is required of the claimant is that he produce objective evidence of an

impairment or impairments and show that the impairment or impairments could produce some degree of the symptoms alleged.  In addition, there must be no evidence of malingering.

Plaintiff has produced objective evidence of an impairment that could reasonably be expected to produce some degree of symptoms resulting in limitations. (Tr. .)  The ALJ did not find that plaintiff is malingering.  Therefore, the analysis moves to a credibility determination.

Under the second part of the analysis, the Commissioner must analyze the credibility of a claimant's testimony regarding the severity of claimant's symptoms. The Commissioner can reject a claimant's symptom testimony only if she makes specific findings, stating clear and convincing reasons for doing so.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Smolen, 80 F.3d at 1281-82.  General findings are insufficient; rather, the ALJ must identify what testimony is not credible, and what evidence suggests that the testimony is not credible.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  The Commissioner cannot reject a claimant's symptom testimony solely because it is not fully corroborated by objective medical findings.  Cotton, 799 F.2d 1403.

In determining a claimant's credibility the Commissioner may consider, for example:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . . In evaluating the credibility of the symptom testimony, the ALJ must also consider the factors set out in SSR 88-13. . . . Those factors include the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; functional restrictions caused by the symptoms; and the claimant's daily activities.

Smolen, 80 F.3d at 1284.

Here, the ALJ found, after considering plaintiff's and Ms. Grieve's statements of his activities and pertinent factors, that plaintiff was not entirely credible. (Tr. 20.) He found that:

> The claimant has stated that he does activities only for short periods of time before resting. Particularly minimal household chores a lot of times cause quite severe pain and he is frequently using his Chi machine at home (Exhibit B-9F/258 [Tr. 379]). He has reported more than once that this machine provides adequate relief. Additionally, Ms. Grieve has noted that the claimant shops for groceries twice a week; visits friends once a week; visits relatives three times a month; talks on the phone once or twice a day (or more); watches TV four hours a day; remembers and discusses what he watches on TV; drives daily and safely even in unfamiliar places; stretches; walks to mailbox every day; reads educational materials, newspapers and self-help books; takes care of a pet adequately and without being reminded; spends hours reading newspapers, and does a lot of paperwork. (Exhibit B-8E/46-55).

(Tr. 19-20.)  The ALJ found that plaintiff's and Ms. Grieve's statements "described normal activities of daily living and socialization, and reveal his abilities to concentrate and stay on task are not significantly impacted, despite his allegations of severe pain."  (Tr. 20.)

The Court finds that the ALJ's reasons for finding plaintiff not entirely credible are supported by the record.  In a Third Party Information on Activities of Daily Living and Socialization completed by Ms. Grieve on December 16, 2002, she indicated that plaintiff saw family members occasionally and talked with family members frequently; he left the house to go to the doctor, visit relatives, and for lawyer appointments, going to the grocery store two times a week, visited friends once a week at home, visited relatives three times a month, and left the house once or twice a day; he talked with another person one or twice a day on the phone; his friends visited him once or twice a month; he watched television for four hours every day; he drove daily and could drive in unfamiliar places and could drive safely; and he listened to the radio or stereo every day.  She indicated that activities plaintiff enjoyed but could no longer do included bike riding, dancing, fishing, camping, long walks, weight lifting, digging in garden, motorcycle, and swimming, due to too much pain; and that plaintiff did not take walks, but that he stretched and walked to the mail box everyday.  She indicated that plaintiff did not prepare the meals and heats up meals she prepared; and that he bathed daily.  Ms. Grieve

indicated that plaintiff did not do any household chores but would take out the trash only if it was not too heavy, he watered the plants, and that he took the car to the shop to be worked on; and plaintiff adequately fed and  cared for his pet without needing to be reminded.   She indicated that plaintiff took certain pain medications which cut down the pain, helped him sleep, and he could concentrate better when he was not in pain.  Ms. Grieve described a typical day for plaintiff:

> Takes care of the dogs.  Walks out to get the paper + Mail watches the news programs in AM.  reads the paper  talks on the phone.  Takes Meds.  Seems to do a lot of paper work lately.  Drives to gas station to get newspaper. Smokes cigs.  Scott reads a lot.  Spends hours reading newspapers.

(Tr. 114.)   In response to the question, "Is there anything about this person's behavior that would interfere with his/her ability to work on a regular basis," Ms. Grieve wrote: "can't work on Meds makes him space out.  Can't concentrate like he used to."  (Tr. 114; 104-15.)

In an Activities of Daily Living and Socialization questionnaire completed on December 16, 2002, plaintiff indicated that he needed help getting in and out of the bathtub and with dressing; Ms. Grieve did the housework due to loss of strength and pain in back and hands; she planned and did the shopping and he needed help to do basic shopping; and he spent two or more hours watching television and listening to news.  He indicated that he had hobbies of swimming, fishing, hunting, camping, and that due to neck and back pain he has been unable to swim or fish

18 - FINDINGS AND RECOMMENDATION

or hunt game; and that his neck and back pain prevents him from helping to give out food and clothing to the needy two times a week. (Tr. 116-22.)

In a Claimant Pain Questionnaire completed the same day, plaintiff indicated that he had severe pain in his neck, shoulders, elbows, back-down legs to both feet; he was always in pain all the time, sitting, standing, walking, and sleeping; sitting, walking, and standing caused the pain; medication made the pain less; and he used a chi machine besides medication. He indicated that he could not be up and active for very long before he needed to rest; he took walks occasionally depending on the pain level; he cleaned his apartment monthly and Ms. Grieve did most of the house chores; he went out in the car occasionally and sometimes someone drove him; and that he ate prepared or canned foods and friends cooked for him.

At the hearing on June 17, 2004, plaintiff testified that his daily routine consisted of:

> Get up, use my Chi [] machine right away, and lay on my stomach and put my Chi machine on my back, to relax my back. And get up and take a hot bath and get dressed. I eat a little something. I try to do as much as I can around the house, and read, do a little more around the house. And then when my back starts going into spasms, I'll use my [Chi] machine on my back.

(Tr. 460.) Plaintiff uses the Chi machine for a half-hour to an hour four or five times a day. Plaintiff reads and, if he's up to it, he'll do some housework and clean up the house, do a little bit of dishes if he can, and a little bit of laundry if possible. He

19 - FINDINGS AND RECOMMENDATION

drives Ms. Grieve to work, which is fourteen-and-one-half miles, which he drives without a break; he thinks he can drive about twenty-five miles, or about one-half hour of driving, without taking a break.  When he cooked or did dishes, he could stand for about five minutes if he pushed himself.  When he sits he's in pain with his lower back; his most comfortable position is standing up walking around.  He's in pain no matter whether he is sitting or standing.  When he cooks, he can do it for "15 minutes easy, you know." (Tr. 463.)  He forces himself to do stuff because he has to.  He walks to the mailbox for exercise, which is about 100 feet.  He uses the Chi machine to relieve the pain level; he has to lie down on his stomach  "To dedicate it on my back, yes," (Tr. 464).  Plaintiff experiences pain in his mid to low back, down his left leg primarily and occasionally spreading to his right leg.  When he grocery shops, he leans on the cart and uses his cane.  He has lifted the groceries from the cart into the car; he can lift a bag of groceries if it's not too heavy.  In response to a question from the ALJ, plaintiff testified that the last time he saw Dr. Brett was the first part of 2003.  (Tr. 460-65.)  Plaintiff was not on any medications, but he took a little bit of aspirin.  Plaintiff is up and down in the course of a night probably three to four times, for one-half hour to an hour each time.  He uses his Chi machine in the middle of the night, "Pretty much" every night.  (Tr. 469-70.)

Ms. Grieve has lived with plaintiff for fourteen years. She testified that plaintiff is much worse since the April 5, 2002, accident because he's in pain all the time and he has a hard time getting around. She can tell he is in pain because "his forehead kind of wrinkles up, and his breathing changes." (Tr. 467.) Plaintiff uses the Chi machine sometimes four to five times a day, sometimes an hour at a time. Since the accident, they don't go fishing or camp, they don't visit a lot, and they don't do a lot of things. Plaintiff helps with the housework, "What little he can, yeah." (Tr. 467.) Chores he does regularly include washing some of the dishes, helping her cook a little bit, washing some of the clothes as long as he's not bending over getting them in the dryer, that is, "He pushes them in the washing machine, that's pretty much it." (Tr. 468.) Plaintiff gets dinner started, but after about fifteen to twenty minutes, he starts to hurt and she finishes it. She thinks plaintiff can stand comfortably "about a half-hour max," and then he starts hurting. (Tr. 468.) Plaintiff can sit comfortably, "Not real long, a half-hour, 15-20 minutes," and he's moving trying to get comfortable again or he has to get up. Plaintiff sleeps for a couple of hours and then he's up walking. (Tr. 466-69.)

On this record, the Court finds that the ALJ provided specific, and clear and convincing, reasons for not finding plaintiff entirely credible.

**Treating Physicians' Opinions**

Plaintiff contends that treating source medical opinions are entitled to deference and there is not substantial evidence in the record, and not clear and convincing evidence to support the ALJ's failure to defer to the opinions of Dr. Warda and Dr. Brett. Defendant argues that the ALJ may reject the uncontradicted opinion of a treating physician only for clear and convincing reasons, and that an ALJ may rely on the opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if specific and legitimate reasons are provided. She contends that the ALJ's conclusion as to Dr. Warda's opinion and Dr. Brett's opinion are supported by the medical record. She contends that the ALJ provided rationale for the weight he gave to the RFC assessments by  the non-examining physicians, Dr. Kehrli and Dr. Jensen,  and adopted those parts he found were supported by the record. Plaintiff replies that the ALJ's rejection of the limitations provided by his treating physicians was not supported by clear and convincing evidence, and that his discounting of those opinions has the effect of concluding that his back did not need surgical repair, a conclusion inconsistent with the record.

Generally, the Commissioner gives more weight to the opinion of a treating source or examining source than to a source who has not treated or examined a claimant.  20 C.F.R. §§ 404.1527(d)(1)(2), 416.927(d)(1)(2); Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  A treating physician is one who is employed to cure.  Magallanes, 881 F.2d

at 751.  His opinion is given more weight because he has a greater opportunity to know and observe the patient.  Id.  Controlling weight will be given to a treating physician's opinion on the issues of the nature and severity of a claimant's impairment(s) if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record.  20 C.F.R. §§ 404.1527(d)(2), 416.926(d)(2).  "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability."  Magallanes, 881 F.2d at 751 (citing  Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989); 20 C.F.R. §§ 404.1527(e), 416.927(e); see also Montijo v. Secretary of HHS, 729 F.2d 599, 601 (9th Cir. 1984).

If the ALJ chooses to disregard a treating physician's or an examining physician's opinion, and that opinion is not contradicted by another doctor, he must set forth clear and convincing reasons for doing so.  Lester, 81 F.3d at 830; Magallanes, 881 F.2d at 751; Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984).  If a treating or examining physician's opinion is contradicted by that of another doctor, the ALJ must set forth specific and legitimate reasons, based on substantial evidence in the record, for disregarding the opinion of the treating or examining physician.  Lester, 81 F.3d at 830-31; Nguyen v. Chater, 100 F.3d 1462, 1466, (9th Cir. 1996).  The ALJ can meet this burden by setting out a detailed and

23 - FINDINGS AND RECOMMENDATION

thorough summary of the facts and conflicting medical evidence, then stating his interpretation, and making findings.  Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986); Rodriguez, 876 F.2d at 762.  Further, the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. Lester, 81 F.3d at 830.  "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (citing Magallanes, 881 F.2d at 751; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)).

Here, the ALJ discussed the treatment records of Dr. Warda and those of Dr. Brett for the period April 2002 through December 2002, (Tr. 16-18), and considered the restrictions imposed by these physicians, (Tr. 20-22).  The ALJ also considered the contradictory assessments of the nonexamining physicians, Dr. Kehrli and Dr. Jensen, (Tr. 22-23).

On April 11, 2002, plaintiff was seen by Dr. Warda several days after a head-on collision.  Plaintiff was in mild distress due to pain symptoms.  Plaintiff was to be seen by Dr. Brett.  (Tr. 386.)  On examination of May 29, 2002, plaintiff's gait showed limp and slowness.  Range of motion was limited in forward flexion by twisting, and lateral flexion and extension were completely intact.  Palpation revealed severe paraspinal muscle spasm in the thoracolumbar region; plaintiff had

radiation of pain down his leg.  Plaintiff was continued on Robaxin and Clinoril, and a prescription was written for a Chi machine, which plaintiff reported worked very well for his pain.  (Tr. 385.)  On June 17, 2002, plaintiff had weaned himself off of Robaxin and Vicodin.  Plaintiff's TENS unit was not very effective for him at that time.  Examination showed full range of motion in his neck, and tenderness in the paraspinal muscles.  He had normal motor function of his lower extremities and sensation was intact.  A Chi machine was ordered which plaintiff was to use as needed; he did not want to go back on addictive muscle relaxants and narcotics. (Tr. 384.)  On October 2, 2002, plaintiff reported that the chi machine was working very well for controlling his low back pain, neck pain, and other pains and arthritic symptoms.  He was looking to restart work and was interested in forklifting and backhoe work.  On examination, plaintiff was in no acute distress; his neck revealed full range of motion with no radiation of symptoms.  (Tr. 382.)  On October  7, 2002, plaintiff was having quite a bit of muscle spasm in his neck and back and the chi machine was working well for him.  Plaintiff wanted to get back to work.  Dr. Warda noted in his progress notes that plaintiff had been limited to fifteen pounds maximum lifting.  (Tr. 381.)  On this same date, Dr. Warda completed an Oregon Employment Department "Request for Medical Information," indicating that plaintiff had been released as able to resume full time work as of October 1, 2002.  Dr.

Warda stated that plaintiff had a fifteen pound weight limit lifting restriction.  (Tr.

80.)  On November 1, 2002, Dr. Warda's progress notes state in pertinent part:

> It has been advised that patient not do any heavy lifting, which means
> probably no more than 10-15 pounds at a time.  This precludes him
> from his previous line of work and currently patient is in need of some
> job retraining for more sedentary type work.  Patient should certainly
> be on disability for his previous line of work as he cannot participate in
> any heavy physical activity whatsoever. . . ."

(Tr. 379.)  Plaintiff reported that he was "only currently taking muscle relaxants at

nighttime . . . ."  (Tr. 379.)

On February 2, 2003, Dr. Warda completed a Department of Human Services

questionnaire indicating that plaintiff could lift "0" weight occasionally and "0"

weight frequently; plaintiff could walk/stand for fifteen minutes in an eight-hour

day, and could sit for five minutes in an eight hour day.  (Tr. 445.)  Dr. Warda

stated:  "Pain is overwhelming minimal activity . . . including walking, cooking,

personal hygiene."  (Tr. 445.)

The ALJ found the "extreme limitations" stated by Dr. Warda in February 23,

2003, to be unsupported by the record as a whole.  (Tr. 20.)  The ALJ pointed out

that the last examination of plaintiff by someone in Dr. Warda's office occurred in

October 2002, in which it was noted that plaintiff had full range of motion with no

radiation of symptoms.  The ALJ noted that the remaining reports from Dr. Warda's

office consisted of restatements of plaintiff's subjective allegations.  A review of Dr.

Warda's progress notes confirms the ALJ's stated reasons.  (See Tr. 377-79, 381-82.)  The Ninth Circuit has found that, "A physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (citing Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

The ALJ further determined that Dr. Warda's statement that plaintiff's pain was overwhelming with minimal activity, including walking, cooking, and personal hygiene, was "obviously" based on plaintiff's subjective allegations, which are inconsistent with reported activity in other portions of the record.  The ALJ noted that reports about plaintiff's activities of daily living show he generally was able to perform them without the limitations described by Dr. Warda.  As discussed, supra, plaintiff's activities as reflected in the record, support the ALJ's determination.  The ALJ determined that little weight should be given to Dr. Warda's conclusions of February 2003 and instead he gave greater weight to actual treatment notes made during the time of treatment.  See Thomas, 278 F.3d at 957 (an ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.").  The Court finds that the ALJ gave specific and legitimate reasons for disregarding the opinion

of Dr. Warda as to plaintiff's limitations which are supported by substantial evidence in the record.

Plaintiff was referred to Dr. Brett, a neurosurgeon, who examined plaintiff on April 23, 2002, finding that plaintiff was in no acute distress, lumbar range of motion was unimpaired and there was no nerve root irritation signs. (Tr. 352-3, 359-60.) On objective examination on November 26, 2002, Dr. Brett found that plaintiff's strength, sensation, and myotatic reflexes were preserved, and there was no wasting or fasciculations; moderate paralumbar muscle spasm was evident and lumbar range of movement was reduced to a residual of forty degrees in forward flexion and ten degrees in extension; and straight leg raising was positive. (Tr. 358.) Dr. Brett noted the findings of plaintiff's lumbar myelogram on December 3, 2003, which showed, "impingement of the L5 nerve roots bilaterally from disc protrusion centrally and diffusely at L4-5 with normal appearance elsewhere in the neck." Dr. Brett suspected plaintiff would require operative intervention. (Tr. 357.) In a letter to Dr. Warda of December 9, 2002, Dr. Brett stated he had seen plaintiff that day and he continued to have low back discomfort and bilateral leg pain, worse on the left; there was a compromise of the L5 nerve in the lateral recess bilaterally with weight bearing and disc loading. Dr. Brett recommended bilateral L4-5 lumbar laminectomy and discectomy. He expected surgery to take place in the near future

and plaintiff was to remain off work in the interim.  Plaintiff was given a prescription

for Tylenol 3.  (Tr. 346.)

In response to a questionnaire provided by the Department of Human

Services, signed on January 20, 2003, Dr. Brett opined with reference to plaintiff:

"No work until 2 wks after surgery."  He states that the restrictions first began on

"December 9, 2003 [sic]."  (Tr. 355.)  Dr. Brett provided an opinion in a letter to

plaintiff's counsel on June 9, 2004, (Tr. 443-44), which he clarified on July 8, 2004,

(Tr. 446).  In was Dr. Brett's opinion that, "if Mr. Fandrich is not able to undergo

operative intervention, he will have a complete and permanent disability with regard

to any gainful employment and will be unable to perform regular employment of any

kind."  (Tr. 446.)  Dr. Brett also stated that, "Certainly, [plaintiff's] description that

he is unable to stand for more than a few minutes at a time and that he needs to

lay on his stomach to relieve his back pain every 2-4 hours, is consistent with my

understanding of his condition."  (Tr. 443.)  He further stated:  "It is felt that he will

be unable to work more than three days per month, if at all."  (Tr. 443, 446.)

The ALJ found that, even with clarification, Dr. Brett's opinion was not entitled

to significant weight because his opinion was not supported by his findings as

reported in his examinations.  The ALJ found that there was nothing noted by Dr.

Brett which would support his conclusion of permanent  disability which would

preclude work except for three days per month.  The ALJ pointed to Dr. Brett's last

29 - FINDINGS AND RECOMMENDATION

examination of plaintiff which took place on November 26, 2002, <u>see</u> <u>supra</u>. He also noted that Dr. Brett gave plaintiff a prescription for Tylenol 3. The ALJ noted that plaintiff had indicated that he had adequate pain control with his medications in November 2002, (<u>see</u> Tr. 378), and that he had reported good results with the Chi machine to manage his pain. He also noted that the evidence suggested that plaintiff had adequate control of his pain and, while limited from heavier work, he was capable of, and planning for, less demanding work. The ALJ also noted that Dr. Brett found no findings on examination which supported plaintiff's description of an inability to stand for more than a few minutes and a need to lay down every two to four hours, and pointed to plaintiff's generally normal activities of daily living, and his management of his pain by use of the Chi machine and his decisions to discontinue or resume his medications. <u>See</u> <u>Thomas</u>, 278 F.3d at 957. On this record, the Court finds that the ALJ gave specific and legitimate reasons for disregarding Dr. Brett's opinion of permanent disability, which the Court finds are supported by substantial evidence in the record.

On February 24, 2003, non-examining physician, Martin Kehrli, M.D., provided an RFC assessment in which he indicated in pertinent part[3] that plaintiff could occasionally lift and/or carry 20 pounds and 10 pounds frequently; and he could

---

[3]    References in the assessment to carpal tunnel syndrome have been discussed, <u>supra</u>.

stand and/or walk, and sit, for a total of about 6 hours in an 8-hour workday. He indicated that plaintiff was limited to stooping and crouching occasionally. He noted that neither Dr. Warda nor Dr. Brett had clarified their opinions, and opined based on Dr. Warda's lifting limitation of 10-15 pounds that plaintiff's RFC from October 2002 to the present was sedentary. (Tr. 403-18.) On April 14, 2003, non-examining physician Linda Jensen, M.D., provided and RFC assessment which, in pertinent part, agreed with the assessment of Dr. Kehrli. (Tr. 419-26.)

The ALJ did not agree with an assessment that plaintiff should be limited to sedentary work for the reason that the opinion did not consider the correct definitions given by the regulations concerning the lifting requirements for each level of exertion. 20 C.F.R. 404.1567(a)(b) provides that "Sedentary work involves lifting more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," and "Light work involves lifting nor more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds." Dr. Kehrli and Dr. Jensen had assessed plaintiff as capable of lifting 20 pounds occasionally, which is light level of exertion and not sedentary. Further, the ALJ pointed out that the source of record offering this opinion appeared more concerned with keeping plaintiff away from his past relevant work which was generally medium to heavy levels of exertion. (Tr. 22.) This observation is supported by the record. Dr. Warda noted in his early October 2002 progress notes

31 - FINDINGS AND RECOMMENDATION

that plaintiff was interested in returning to work.  (Tr. 381, 382.)  Dr. Warda stated

on October 2, 2002:

> Patient is looking to restart work and was asking me advice about what
> type of work would be more appropriate.  He is interested in forklifting
> or backhoe work.  I said forklift would probably be much better as long
> as he is not doing any heavy lifting with that.   Backhoe and
> frontloading type machine work would not be appropriate at this time
> as it is oftimes very jarring and can be somewhat traumatic to his back.

(Tr. 382.)  On November 1, 2002, he stated:

> It has been advised that patient not do any heavy lifting, which means
> probably no more than 10-15 pounds at a time.  This precludes him
> from his previous line of work and currently patient is in need of some
> job retraining for more sedentary type work.  Patient should certainly
> be on disability for his previous line of work as he cannot participate in
> any heavy physical activity whatsoever.

(Tr. 379.)

The Court finds that the ALJ's adoption of the non-examining physicians'

assessments as they relate to plaintiff's capacity for a limited range of light exertion

work rather than those of plaintiff's treating physicians is supported by substantial

evidence in the record.

**Hypothetical**

Plaintiff contends that the hypothetical posed by the ALJ to the vocational

expert (VE) did not contain take into account the limitation from any work at all by

Dr. Brett and Dr. Warda until after the proposed surgery, that is, there was no

medical support for the limitations proposed; and the hypothetical did not include

his hand/wrist restrictions from carpal tunnel syndrome.  Plaintiff also contends, first, that the hypothetical was for sedentary work, but the jobs proposed by the VE were in the light range; later, plaintiff contends that the hypothetical posed was for light, rather than sedentary work.  Defendant responds that the ALJ's hypothetical was accurate, detailed, and supported by medical evidence.  She contends that plaintiff's assertion that the ALJ's hypothetical was incomplete should be rejected. In reply, plaintiff contends that the VE's response to the ALJ's first hypothetical was for light work jobs.  Plaintiff contends that, in response to the ALJ's question, "'Could someone do this job of packing and I [sic] inspecting, if they ended up sitting six of eight hours, and standing two of eight hours?'" the response did not indicate how many of those jobs were available in the national and regional economies with a sedentary restriction and, therefore, the record was not fully developed.

A hypothetical which fails to include all of a claimant's limitations does not constitute substantial evidence.  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).

Here, the ALJ posed a hypothetical to the VE as to an individual of the same age as plaintiff and with the same educational background and past work experience, as follows:

33 - FINDINGS AND RECOMMENDATION

this hypothetical person is capable of lifting and carrying 20 pounds occasionally, 10 pounds more frequently. Would be able to stand only two of eight hours, sit six to eight hours. Should have the opportunity to change positions every hour or so, just for a few minutes to stretch essentially. And would only occasionally be able to stoop, crouch, bend. And would be capable of simple, one, two, three step work because of distractions of pain.

(Tr. 473.)

The Court has found that the ALJ properly disregarded Dr. Warda's opinion as to plaintiff's limitations and that properly disregarded Dr. Brett's opinion of permanent disability. Accordingly, the ALJ did not need to include these limitations in the hypothetical posed to the VE.

The Court has also found that the ALJ's conclusion that he did not see anything in the record to support manipulative restriction as a result of carpal tunnel syndrome was supported by the record, see supra. Accordingly, the ALJ did not need to include any limitations in the hypothetical posed to the VE due to plaintiff's carpal tunnel syndrome.

As to plaintiff's contention regarding restrictions due to light versus sedentary work, the Court notes that the hypothetical posed by the ALJ was for light work, and the VE identified two positions--small products assembler and packager/inspector. The VE testified that as to packager/inspector, there were 690,000 in the national economy and 3,000 regionally. (Tr. 473.) After this testimony, plaintiff's attorney asked the VE whether the sitting restriction of six hours in the hypothetical was

better characterized as sedentary work rather than light work.  The ALJ asked the

VE the attorney's question in another way:  "could someone do this job of packing

and inspecting, if they ended up sitting six of eight hours, and standing two of eight

hours?"  The VE responded that he could.  (Tr.  475.)  Social security regulations

define light work as follows:

> Light work involves lifting nor more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range
> of light work, you must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he or she
> can also do sedentary work, unless there are additional limiting factors
> such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F. R. § 404.1567(b).  Sedentary work "involves lifting no more than 10 pounds

at a time and occasionally lifting or carrying articles like docket files, ledgers, and

small tools."   A sedentary job involves sitting, but a certain amount of walking and

standing is often necessary in carrying out job duties.  20 C.F.R. § 404.1567(a).

The ALJ's question restating the attorney's question to the VE posed the same

sitting and standing restrictions as stated in his first hypothetical; the VE testified

that an individual with these restrictions could do the job of packer/inspector, as he

had identified, which was considered light work.  The VE had already testified to the

numbers of jobs of packager/inspector in the national and regional economies, and he did not need to repeat the information.

The Court finds on the record that the ALJ's hypothetical was not incomplete as contended by plaintiff.

## **RECOMMENDATION**

Based on the foregoing, it is recommended that the decision of the Commissioner be affirmed, and that judgment be entered accordingly.

**This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the court.  Thereafter, the parties have ten days within which to file a response to the objections.  Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.**

36 - FINDINGS AND RECOMMENDATION

DATED this ___18___ day of January, 2007.


_____/s/_____
JOHN P. COONEY
United States Magistrate Judge